UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JEFFREY WUMMEL,

      Plaintiff,

vs.                                                                                    Case No. 09-14301

METROPOLITAN LIFE INSURANCE
COMPANY d/b/a METLIFE DISABILITY
and PLAN ADMINISTRATOR FOR
METLIFE DISABILITY,                                                   HON. AVERN COHN

      Defendants.
_____/

**MEMORANDUM AND ORDER**
**GRANTING DEFENDANTS' MOTION TO AFFIRM DECISION AND FOR ENTRY OF**
**JUDGMENT BASED ON THE ADMINISTRATIVE RECORD**

I. Introduction

This is a benefits case under the Employment Retirement Income Security Act,

29 U.S.C. § 1001, et seq (ERISA).  Plaintiff Jeffrey Wummel (Wummel) is suing

defendants Metropolitan Life Insurance Company d/b/a MetLife Disability and Plan

Administrator for MetLife Disability (MetLife).  Wummel claims that MetLife wrongfully

denied his claim for long term disability (LTD) benefits under the IBM Long-Term

Disability Insurance Plan (Plan) maintained by his former employer, IBM, and issued

and administered by MetLife.  Specifically, Wummel says that MetLife's determination

that his chronic headaches did not render him disabled under the Plan is arbitrary and

capricious. The matter is before the Court on MetLife's Motion to Affirm Administrator's

Decision and for Entry of Judgment on the Administrative Record.  For the reasons that

follow, MetLife's motion will be granted.

## II. Legal Standard - Motion for Entry of Judgment

In <u>Wilkins v. Baptist Healthcare System, Inc.</u>, 150 F.3d 609 (6th Cir.1998), the

Court of Appeals for the Sixth Circuit held that summary judgment procedures may no

longer be used in the Sixth Circuit in denial of benefits actions under ERISA.  In <u>Wilkins</u>,

the court of appeals decided a district court should adjudicate an ERISA action as if it

were conducting a standard bench trial and, therefore, determining whether there is a

genuine issue of fact for trial would make little sense.  150 F.3d at 618-19 (Gilman, J.,

concurring in part and setting out the judgment of the court of appeals on the issue

regarding the summary judgment standard).

Accordingly, the Court will decide this matter under the guidelines set forth in

<u>Wilkins</u>[1] by rendering findings of fact and conclusions of law based solely upon the

administrative record.  <u>See Eriksen v. Metropolitan Life Ins. Co.</u>, 39 F. Supp. 2d 864

(E.D. Mich. 1999).

---

[1]  The court of appeals' "Suggested Guidelines" are as follows:
1. As to the merits of the action, the district court should conduct a <u>de novo</u> review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly.  The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator.
2. The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part.  This also means that any prehearing discovery at the district court level should be limited to such procedural challenges.
3. . . . the summary judgment procedures set forth in Rule 56 are inapposite to ERISA actions and thus should not be utilized in their disposition.
150 F.3d at 619.

2

III. Analysis

A. Standard of Review

The parties agree that the standard of review in this case is whether the denial of benefits was arbitrary and capricious because MetLife had discretionary authority to construe and interpret the plan.[2]  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 983 (6th Cir. 1991). This standard is the "least demanding form of judicial review."  Administrative Committee of the Sea Ray Employees Stock Ownership and Profit Sharing Plan v. Robinson, 164 F.3d 981, 989 (6th Cir. 1999).  This requires "review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." McDonald v. W.-S. Life Ins. Co., 347 F.3d 161, 172 (6th Cir.2003).  The plan administrator's decision should be upheld if it is "the result of a deliberate, principled reasoning process" and "supported by substantial evidence."  Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir. 2006), aff'd, Met. Life Ins. Co. v. Glenn, 544 U.S. 105 (2008). The standard, although deferential, is not "inconsequential."  Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005).  "While a benefits plan may vest discretion in

_____

[2]  The Summary Plan Description provides that the Plan Administrator or its delegate, MetLife, has discretionary authority to interpret plan provisions and make eligibility determinations:

> 3.4.27 Discretionary Authority of Plan Administrator and Other Plan Fiduciaries
> In carrying out their respective responsibilities under the LTD Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the LTD Plan and to determine eligibility for and entitlement to LTD Plan benefits in accordance with the terms of the LTD Plan.  Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

3

the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." Id.

Moreover, the Sixth Circuit has made clear that a court is to consider several factors in reviewing a plan administrator's decision, including the existence of a conflict of interest, the plan administrator's consideration of the Social Security Administration determination, and the quality and quantity of medical evidence and opinions. Glenn, 461 F.3d at 666.

Here, a conflict of interest exists because MetLife was both responsible for reviewing and paying benefits. The Supreme Court has held that a conflict of interest exists for ERISA purposes where the plan administrator evaluates and pays benefits claims, even when, as here, the administrator is an insurance company and not the beneficiary's employer. Glenn, 128 S.Ct. at 2348-50. A court will give more weight to the conflict "where circumstances suggest a higher likelihood that it affected the benefits decision...." Id. at 2351. A conflict may affect a benefits decision in several ways. For example, although the treating physician rule does not apply in ERISA cases, the Supreme Court has acknowledged that "physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and preserve their own consulting arrangements." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832, (2003). The Sixth Circuit has observed that when a plan administrator both decides claims and pays benefits, it has a "clear incentive" to contract with consultants who are "inclined to find" that a claimant is not entitled to benefits. Kalish v. Liberty Mutual/Liberty Life Assurance, 419 F.3d 501, 507 (6th Cir. 2005). The Court will consider Metlife's conflict as a factor in evaluating its

4

decision to deny Wummel benefits.[3]

B.  Findings of Fact

The following facts are gleaned from the administrative record.

1.  Relevant Plan Provisions

a.  Definition of Disability

The plan defines disability as follows:

"Disability" or "Disabled," means that, due to Sickness or as a direct result of accidental injury:

•      You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and

•      You are, during the Elimination Period and the next 12 months of Sickness or accidental injury unable to perform each of the material duties of Your Own Job, and

•      You are, after such period unable to perform the duties of any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.

The Plan defines "Own Job" as follows:

Own Job means the essential functions You regularly perform for the Policyholder that provide Your primary source of earned income.

Finally, Wummel has the burden to provide proof of disability.  The Plan provides:

Items to be Submitted for a Disability Income Insurance Claim
When submitting Proof on an initial or continuing claim for Disability Income Insurance, the following items may be required:
• documentation which must include, but is not limited to, the following information:

---

[3]  Wummel says that as a result of this conflict, a <u>de novo</u> standard of review should apply.  This argument is not well-taken.  The case law is clear that a conflict of interest is a factor in evaluating a claim and does not alter the otherwise applicable standard of review.

5

- the date Your Disability started;
- the cause of Your Disability;
- the prognosis of Your Disability;
- the continuity of Your Disability; and . . .

### 2. Wummel's Claim

#### a. Background

Wummel, then age 42, was employed by IBM as a Systems Analyst - Security Specialist from March 2003 until he left employment on July 11, 2006. Before his employment with IBM, Wummel worked for Visteon Corporation and Ford Motor Company as an information technology analyst. Included in the Administrative Record are two appraisals of Wummel's job performance at IBM, one completed January 23, 2006, the other completed January 27, 2005. Both appraisals rated Wummel as a "solid contributor" and reflect IBM's favorable assessment of his performance. Neither assessment stated that, in 2004 or 2005, Wummel had any problems performing his job as a result of headache, or any other factor.

#### b. Initial Review

On December 11, 2006, Wummel submitted a claim for LTD benefits claiming that headaches beginning in Ma, 1993, now disabled him. Dr. Todd Rozen, a neurologist and Wummel's treating physician, completed the Statement of Attending dated December 26, 2006. Dr. Rozen reported that he first saw Wummel in 2003 for chronic daily headaches. He states that Wummel suffers from "chronic head pain [which] results in reduced concentration and memory." Dr Rozen opined that Wummel was disabled from his and any occupation and would be re-evaluated in a month, in January of 2007. Dr. Rozen did not assess whether Wummel was suitable for

vocational or therapeutic rehabilitation.

Wummel also submitted medical records from three physicians at the Mayo clinic where he was evaluated in April 2006.  These records show the following.  On April 25, 2006, he was examined by Dr. Allen Aksamit, Jr., M.D. Neurology, Mayo Clinic.  Dr. Aksamit recorded Wummel's history as follows:

> Mr. Wummel is a 42-year-old man from Harper Woods, Michigan, who is self referred for evaluation of daily headaches. I reviewed the history as recorded by Dr. Tracy. I took history from the patient.  Briefly, the patient thinks that he has had lifelong headaches, although there is little bit of difficulty in pinning him down about that issue. In high school, he states that he was "not as sharp" and at times "not as focused," by which he means he may have had a headache at that time, although he in specific he cannot recall precise headache.  He notes that he sought medical attention for his current headache symptom complex in 1997, but he thinks it has been present with him all of his wakeful life.  He describes it as a bifrontal crown-area discomfort associated with an aching quality that is constant. He describes it as 3 to 5 out of 10 and never more severe than that. It is not associated with nausea or vomiting.  There is only minimal photophobia.  He is not aware of any recent change in character. In trying to ask him about positional exacerbation, he notes that he does get some restorative effect of lying down for a period of 15 to 20 minutes when he is working from his home, but he states that it does not really make the headache go away or help the headache.  He works as a system analyst and works primarily at the computer screen.  He also, however, is fairly athletically active and participates in ice hockey, golf, and volleyball, and does not note that this particularly exacerbates the headache.  It is hard for him to identify any exacerbating factors, and he notes that if he has been drinking the night before, he will wake up and the headache will be somewhat worse.

AR 779-780.  The results of the physical examination performed by Dr. Aksamit are as follows:

> PHYSICAL EXAMINATION
> Neuro: The neurologic examination is normal. The details are recorded on the neurologic sheet. I examined the patient. Gait and station are normal. Lumbar and the remainder of the spine examination is normal. Funduscopic examination shows normal venous pulsations and normal optic discs. Reflexes are symmetrical and normal throughout. The details are recorded on the neurological sheet.
> IMPRESSION/REPORT/PLAN:

#1 Chronic daily headaches
Patient's symptoms are those of a chronic daily headache. The major issue is this a primary symptom complex or secondary? There is nothing to clearly give a clue about the cause from his history, and his examination is normal.

On April 25, 2006, Dr. Jennifer A. Tracy, M.D., Neurology, Mayo Clinic, also examined Wummel.  The history taken by Dr. Tracy is similar to that recorded by Dr. Aksamit, with the addition of the following:

> His headache does not wake him out of sleep and does not prevent him from going to sleep.  He currently goes to bed at 11 p.m. and wakes up at 6 a.m. and feels well rested.  He does not wake up at night.  He says that he occasionally snores. No one has ever told him he has periods when he stops breathing. He sometimes takes a 15- to 30-minute nap in the afternoon but does not need more than that. He says that he never really had to miss school because of this and never had to miss work because of this. He is working at home at this point as a systems analyst for IBM, and he says that it affects his concentration and makes it difficult for him to work but has been managing thus far. He feels that his work is not particularly stressful. He always feels under some time pressure to get things done but cannot identify any major stressors in his life.

AR 777-778.  The results of the physical exam performed by Dr. Tracy were normal (AR 779).  Dr. Tracy stated:

> IMPRESSION/REPORT/PLAN
> #1 Chronic daily headache
> The patient seems to be suffering from a chronic daily headache, tension type. It had no migrainous features even at its onset of autonomic accompaniments.

AR 779.

On April 27, 2006, Wummel was examined by Mayo Clinic's Dr. Swanson, M.D. Neurology.  Dr. Swanson's report recounts the history given by Wummel and is similar to the reports of Drs. Aksamit and Tracy.  Dr. Swanson added that Wummel reported that:

> the pain is described at squeezing or tightness.  They [the headaches] vary in severity from mild to moderate.  The pain is described as constant and non-pulsatile.  There is no associated nausea or vomiting nor is there any

8

photophobia or osmophobia.  He occasionally has mild photophobia/ The pain is not worsened by changes in position or physical activities.  There seems to be no specific predictability with respect to when the headache is a bit less or a bit worse during the day.  HE has no problems sleeping because of the headache.  He has felt that there has been a general trend particularly over the last couple of years for the headache to become more prominent and this is now interfering with his ability to maintain, sustain concentration such as when he is trying to do his work.  Furthermore, he feels fatigued much of the time and he may take 30 to 60 minute breaks because of the headache.

AR 775.  In addition, Dr. Swanson reviewed the results of an MRI performed at the

Mayo Clinic:

The patient has undergone an MRI of the head here at Mayo which shows no significant abnormalities which would account for his headaches. Again, I agree with Dr. Aksamit's and Dr. Tracy's diagnosis of chronic tension-type headaches.

AR 776.  On physical examination, Dr. Swanson found:

PHYSICAL EXAMINATION
General appearance: appears younger than stated age, well groomed, casual dressed
Pain behaviors observed: none
Mental Status:  Mr. Wummel was pleasant and cooperative, forthcoming with information during interview. Eye contact was direct. Speech was of normal rate and tone; conversation was focused on topic, goal oriented. Memory appeared normal as evidenced by accurate account of medical history. Mood was euthymic and the affect was congruent. There was no evidence of disorder in thought, form or content. This was evidenced by clear and consistent ideation and thought process. Fund of knowledge appears appropriate for level of education, age, and life experience. Abstract reasoning and judgment appeared intact. He verbalizes no suicidal or homicidal thoughts, intent or plan.

AR 774.

Each Mayo Clinic doctor noted that although Wummel had tried numerous

treatments in the past and taken many different kinds of medication, Wummel was not

currently taking any medication to treat the headaches.  The doctors referred him to a

Mayo Clinic pain management treatment center. (AR 773,778,780).  To that end,

Wummel was seen by a Susan M. Bee, RN, CNS Pain Rehabilitation Center.  To her,

Wummel reported more significant symptoms of his headaches, including having periods of nausea and memory and concentration problems and that the headaches impacted all areas of his life. Bee recommended treatment at the pain management center. AR 773.

Wummel chose not to continue with the pain management center and instead elected to resume treatment with Dr. Rozen of the Michigan Head-Pain & Neurological Institute (MHNI) where he had received treatment starting in 2003.

As part of MetLife's initial review of his claim, Wummel's medical records were reviewed by Dr. Leonid Topper, an Independent Physician Consultant, Board Certified in Neurology. In his January 29, 2007 report (AR 723-725), in response to the questions posed by MetLife, Dr. Topper responded as follows:

> 1. Does the medical reviewed support employee's inability to perform the functions of his sedentary job?
> No, the medical documents do not support the claimant's inability to perform the function of his sedentary work.
> 2. What are appropriate restrictions/limitations?
> There is no need in restrictions and limitations. The claimant is fully functional in his own occupation.
> 3. Is the employee under appropriate care and treatment?
> No. The claimant was treated by several general neurologists. The referral to a headache specialist was proposed at Mayo Clinic, but was never made. The claimant was never formally assessed for depression which is an integral part of treating chronic daily headaches. Treatment trials were not documented to include sufficient doses and duration of preventive medications.
> 4. Please comment on prognosis
> The claimant would have fair prognosis for his chronic daily headaches if the problem would be addressed at a tertiary headache management center.

> Dr. Topper gave the following assessment:

> Assessment/Rationale:
> The medical documentation didn't demonstrate any objective findings on the

claimant's neurological examination. The claimant complains of chronic daily headaches, but does not use any abortive medications for headaches, which is highly unusual. There were no reports by the claimant's employer or by treating physicians of a decreased cognitive performance.  The claimant dos not take any medications which could affect his cognitive performance.  He is clearly capable in expressing himself clearly and coherently in all the paperwork completed by him, such as Personal profile and disability claim.  The claimant was described as having flat affect and not expressing any obvious pain, by Dr. Rozen.  The results of MRI,[4] MRA,[5] and cartioid sonography were normal.

AR 723-724.

On February 7, 2007, MetLife forwarded a copy of Dr. Topper's report to Dr. Rozen along with a copy of a surveillance CD conducted on January 24, 25 and 26, 2007 which showed Wummel engaging in normal activities, driving his truck, walking his dog, visiting an auto repair shop, and restaurants.  MetLife asked Dr. Rozen to provide any comment by February 14, 2007.  No response was received from Dr. Rozen.

On February 22, 2007, MetLife advised Wummel that the review of his claim had been completed and that he was not eligible to receive LTD benefits.  See AR 712-713. In its denial letter, MetLife explained that in order to receive LTD benefits, the claimant must complete a 26 week waiting period and during the next 12 month period be unable to perform the material duties of his/her occupation.  MetLife advised Wummel that Dr. Topper, an Independent Physician Consultant, Board Certified in Neurology, had reviewed Wummel's medical records and opined they did not demonstrate clinical findings on his neurological examinations that supported his claim and that he was not

---

[4]  The MRI scan goes through the patient's body point 1 by point, building a map of tissue types.

[5]  Brain MRA scans are used to specifically evaluate the vessels of the brain for aneurism, stroke and Arteriovenous Malformations.

disabled from performing his own occupation.  MetLife further advised Wummel

that there were no reports from Wummel's employer or from his doctors indicating a

decrease in cognitive performance, and that the documentation completed by Wummel

regarding his claim for benefits showed that he was clearly capable of expressing himself

without difficulty.  Further, MetLife stated that the results of Wummel's MRI, MRA and

Carotid Sonography were normal.  Finally, MetLife advised Wummel that a copy of the

report prepared by Dr. Topper and the surveillance video had been sent to Dr. Rozen for

his comments, but no response had been received.

MetLife also advised Wummel of the appeal procedure should he chose to contest

the determination.

### c.  Appellate Review

On June 14, 2007, attorney Robert J. Sogge wrote to MetLife advising that he had

been retained by Wummel to appeal from the denial of his LTD claim.  Enclosed with the

letter were voluminous documents, AR 242-708,[6] in support of Wummel's  appeal.  On

appeal, Wummel addressed his evaluation at the Mayo Clinic as follows:

---

[6]  The additional documents identified as AR 268-310, relate to years 2002 to
2005; AR 311-323 are records from Mayo Clinic previously considered by MetLife; AR
326-353 are brochures published by Mayo Clinic; AR 354-362 are some records from
the 1990s through 2004, that are not relevant to Wummel's disability claim in 2006 and
2007; AR 263-369, MRI results finding no abnormalities of Wummel's head to support
disabling headaches; AR 386-412, a brochure and information published by MHNI; AR
473-498, 521-528, material published by MHNI, AR 498-520, subjective reporting of
headaches and other ailments by Wummel; AR 530-538, records of charges for
medication; AR 543-592, medical records mostly from the 1990s; AR 593-608, brochure
explaining Chelation Therapy; AR 609-628, chart of treatment history providing little
relevant information regarding disability in 2007; and AR 635-709, past appraisals of
Wummel's job performance at Visteon (2001, 2002) and Ford Motor Company
(1991-2000).

> Mr. Wummel was disappointed with the results at the Mayo clinic. Even though
> the clinic performed an MRI and an Ophthalmology exam, he had already
> undergone these tests multiple times.  He had hoped for a more extensive amount
> of testing. After meeting with Dr. Jennifer Tracy, Dr. Allen Aksamit and Dr. J.
> Swanson, they could only confirm that he suffered from chronic daily headaches -
> tension type. There was no treatment program at the
> Mayo Clinic for this type of headache. They could only recommend a few drugs to
> try - Nortriptylene and Depakote. The only other recommendation from the doctors
> was the Mayo Clinic Comprehensive Pain Rehabilitation Center. The center offers
> no treatment, it only offers guidance in managing your life with chronic pain.

AR 246.

> The appeal also described Wummel's subsequent treatment at MHNI:

> Mr. Wummel was admitted to the MHNI hospital program, which was a
> combination of advanced treatment along with rehabilitation programs to help
> individuals with constant pain improve functioning.

AR 247.  However, Wummel did not dispute the activities witnessed by the surveillance

and responded as follows:

> Both Dr. Pingel and Dr. Rozen did not see a need to respond to the video, since
> there was nothing to comment on. Both doctors know that Mr. Wummel is single
> and lives by himself, and that he needs to run his own errands. They are also
> aware that Mr. Wummel plays sports, which has been documented in their notes
> and encouraged by both of them.  Exercise and normal activity is strongly
> encouraged by both MHNI and the Mayo Clinic as part of their program for
> patients dealing with constant headache pain.

> As to Wummel's job performance for 2004 and 2005 as not being indicative of

disability, Wummel explained that he decided that it was in his best interest to keep his

health concerns private:

> Until 2006, Mr. Wummel did not reflect his doctor appointments on his timesheets.
> He simply tried to ensure that he was working at least 40 hours a week and
> meeting the expectations of the business client. In 2006, Mr. Wummel started to
> claim his doctor appointments on his timesheets, and also claimed overtime
> required to make-up the hours.

AR 251-252.  Although much of the material submitted by Wummel in support of his

appeal, predated his claim for Plan benefits by years, see n. 6 supra, MetLife considered it.  MetLife also considered office visit notes from the MHNI during the period from January 13, 2003 through January 24, 2007.  AR 413-472.

These records show that Wummel's medical examination in 2003 at MHNI was essentially normal, AR 413-420.  Notes from that period showed that Wummel engaged in regular exercise including cardiovascular exercise on a bike for at least 30 minutes and was participating in ice hockey games one to two times per week, AR 423.  Office notes from August 1, 2003, revealed that Wummel continued to complain of headaches, but that he continued working as a systems analyst and was active in sports, "including softball and golf as well as running and weightlifting."  AR 426.  Office visits through June, 2004, continued to evidence Wummel's complaints of headache, AR 436, however in August 2004, Dr. Rozen found no etiology for Wummel's complaint of headache on a CT scan conducted at that time.  AR 438.  On May 10, 2006, Dr. Rozen, who had last seen Wummel in 2004, noted that his complaints of headaches continued.  AR 441.

Additional records show that on July 5, 2006, Wummel began treatment with Jeffrey Pingel, Ph.D., whose notes, AR 442-443, show that Wummel complained of headaches of a level of 3-4 on a pain scale of 0-5.  Dr. Pingel noted that Wummel, nonetheless, continued to work for IBM as a systems analyst, mostly from home:

> WORK STATUS: He works as a systems analyst for IBM, but working primarily from home.  He only goes to the office one day in every two weeks, contracted to work for the Visteon Company. He often works on the computer. He states he has been able to maintain good performance despite his headaches but admits to feeling "fuzzy" with his concentration and memory. . . .

AR 442.

Also included were records showing that on July 15, 2006, Wummel was admitted

to Chelsea Community Hospital, AR 444-445.  The results of the physical examination there state:  "He is a well-nourished, normally developed adult male in no apparent acute physical distress.  He is alert, oriented, pleasant and  cooperative." AR 445. See also a similar report at AR 446 ("Alert and oriented x 3, in no apparent distress.").  The Psychology Discharge Report from the Chelsea Community Hospital, July 29, 2006, recounts that the hospital staff discouraged him from pursuing disability, and suggested, at most a modified work schedule:

> During the latter days of his hospital stay, the patient informed the medical team that he did not believe he would be able to return to work following this hospitalization, if he continued to experience no change in his head pain. Psychology staff discouraged him from pursuing disability, but rather suggested that he consider a modified work schedule or reduced work hours.

AR 451.

Dr. Pingel's office notes from September 7, 2006, evidence some inconsistencies in Wummel's reports of his symptoms.  For example, although Wummel complained that headaches compromised his mental focus, nevertheless he appeared to function normally on most days and his mood was good:

> [Wummel] continues to have daytime sleep though he states it "fluctuates;" On some days he is sleeping two to three hours a day; the patient states that he needs to lie down because of the headache. Sometimes, lying down on his couch for the entire day. On the other hand, the patient is still meeting much friends and socializing, attending a fitness gym, walking a couple of miles with a neighbor. He has a normal appetite. He is able to go shopping.  He describes his mood as "good." So I question how his mood can be good given that he has an intractable headache and is unable to work.  The patient states that he tries to "keep it in perspective" and "keep pushing forward."

AR 461.  Similarly, on January 24, 2007, Dr. Pingel reported:

> Psychotherapy and treatment monitoring session. No change in headache status. The patient is denying mood disturbance.  As usual, he does not look particularly painful.

AR 472.

On June 29, 2007, MetLife advised that Wummel's claim had been referred to an Independent Physician Consultant for review. AR 241. On July 17, 2007, Dr. Susan H. Pierson, Board Certified in Neurology, submitted her report to MetLife, AR 223-229. After reviewing the voluminous records provided (AR 224-225 lists everything reviewed), Dr. Pierson attempted on several occasions to talk with Dr. Rozen, but was unable to reach him. AR 225.

Dr. Pierson, responding to questions posed by MetLife, opined that the medical information did not support functional limitations as of July 12, 2006. AR 226. Dr. Pierson's responses to questions posed are as follows:

> The employee must be functionally impaired from his date of disability of 07/12/2006 through his elimination period of 01/10/2007 and from 01/10/2007 to the present.

> 2. If the medical information does not support functional limitations for the time period under review, please use the above format to document your conclusions.

> The patient has lived with moderate pain ranging from 3-6/10 in his head with no secondary neurological complications such as vision loss, persistent motor or sensory deficit and no evidence of a neural basis to this pain. There is no evidence of a musculosketal or allergic etiology to it and there is no evidence of neuropathic pain, pain radiating from the cervical spinal roots as a source. Therefore, it appears that this pain, while there, is chronic and stable, and presumably tolerable enough that he has been able to work until 2006, performing with good job reviews.

> There is no evidence that the symptoms have changed substantially since he stopped working and it is clear that he has never responded to any of the medications or other treatment trials he has been given, including not only pain medication but behavioral therapy recommendations, physical therapies such as chiropractor, messages, acupuncture, etc. He appears to function well enough to be able to monitor an incredibly detailed stack of medical notes, records, financial and insurance and employer documentation all surrounding this complaint of headache. This organization is impressive and demonstrates his ability to utilize computer word processing and spreadsheets to a high degree, suggesting

16

exceptional cognitive abilities in the areas of sustained concentration and executive organization. Supporting normal cognition are the notes of the psychologist, Dr. Kotlowski PhD in July 2006 and the notes of Dr. Rozen at the same time. All of the Mayo Clinic notes support a self-limited unresponsive to treatment level of head pain though no mention is made by any neurologist that this patient is disabled from his job.

AR 227 (emphasis added). Dr. Pierson stated in her Assessment:

Assessment/Rationale:
What is lacking in this patients presentation is a condition severe enough to functionally impair him neurologically i.e. motorically sensory and pain - wise, cognitively. There is no evidence of a degenerative or episodic debilitating or functionally impairing disorder in this case. There is evidence of patient report of pain that is "disabling" yet he is able to do other things that are more physical such as go for walks, drive and keep records on his word processor which suggest he is capable of the position he previously performed. There is no evidence that the pain is severe enough to limit his ability to function in his job or that it has affected his cognitive or professional performances. His job reviews have all been very good to excellent since 2001. Therefore, from a neurological perspective the medical information does not support functional limitations as of 7/12/2006.

AR 228-229.

On July 16, 2007, MetLife forwarded Dr. Pierson's report to Drs. Rozen and Faber for comment. MetLife requested that the treating physicians provide clinical evidence in support of their conclusions if they disagreed with Pierson. See AR 230-231. Neither Dr. Faber nor Dr. Rozen responded.

On August 8, 2007, after completing its review of Wummel's appeal, MetLife advised Wummel through his counsel that the decision to deny LTD benefits was upheld. AR 214-216. MetLife explained that under the terms of the Plan, LTD benefits were payable if during the waiting period (180 days) and for the first 12 months thereafter, he was unable to perform the material duties of his regular occupation with IBM because of sickness or injury. MetLife advised that it had reviewed the entire file, including

information from December 1997 through July 2007.  MetLife advised that review of the results the MRI, MRA, MRV (Magnetic Resonance Venography) and TCD (Transcranial Doppler) of the brain were normal.

Further, MetLife advised that the file had been reviewed by Dr. Pierson, who was unsuccessful in her attempts to speak with Dr. Rosen. MetLife explained that Dr. Pierson had rendered an expert medical opinion that the information submitted did not support functional limitations as of July 12, 2006:

> There is no evidence that the pain is severe enough to limit his ability to function in his job or that it has affected his cognitive or professional performances.  The IPC noted that Mr. Wummel's job reviews have all been very good to excellent since 2001. The pain is totally subjective and the supportive information which would include his history, his family history, his physical and lab and radiation findings, his response to a wide variety of traditional and paramedical interventions suggest that Mr. Wummel has a condition which responds to nothing in terms of a total cure and yet is not severe enough to prevent him from living, driving and interacting socially in an independent way. He has done well up until July, 2006, yet there is no documentation which states that he is any worse now neurologically or pain intensity-wise than he was 12 or 24 months earlier.

AR 215.  MetLife further explained:

> Review of the information that has been submitted on appeal, along with the information on record, does not document that Mr. Wummel's condition was of a severity to prevent him from performing the essential duties of his own job as a SAP Security Specialist.  There are no neurological complications such as vision loss, persistent motor or sensory deficit and no evidence of a neural basis to this pain noted in the file.  There is no evidence of a musculosketal or allergic etiology to it and there is no evidence of neuropathic pain or pain radiating from the cervical spinal roots as a source.  Review of Mr. Wummel's file also indicates that he has the ability to utilize a computer and spreadsheets to a high degree, suggesting exceptional cognitive abilities in the areas of sustained concentration and executive organization.  Therefore, the original claim determination was appropriate.

AR 216.

On May 27, 2009, almost two years after MetLife upheld its denial of Wummel's

claim for LTD benefits, a different attorney and Wummel's present counsel, Joni Fixel, requested reconsideration of his claim. Attached to a letter were the results of a neuropsychological evaluation conducted by Firoza B. Van Horn, a psychologist, during the first three months of 2008. See Attachment Two, AR 199-209. The report recounts Wummel's complaints of headache, it also notes that Wummel continued to engage in activities which are inconsistent with constant headache:

> Mr. Wummel states that he still participates in recreational activities. He plays ice hockey twice a week and he belongs to a hockey team. He plays golf in the summer months. He also plays softball once in a while. He walks his dog everyday. He has a lot of friends. He states that "some days are better than others."

AR 201. The results of the various tests that were administered all demonstrated that Wummel has above average intelligence cognitive abilities. Attachment 4 to Wummel's request for reconsideration, AR 213, is a letter from Dr. Pingel to Wummel dated July 2, 2008. Dr. Pingel stated that Wummel had only appeared at the MHNI clinic only once in 2008. Dr. Pingel had contacted a representative of IBM about work accommodations and recommended that if Wummel returned to work, he should do so in a gradual manner. '

MetLife responded to the reconsideration request advising that the August 8, 2007 letter on Wummel's appeal, was the final determination and that no further appeals would be considered.

## C. Conclusions of Law

As an initial matter, MetLife's argument that Wummel's breach of fiduciary duty claim in count II must fail. Under Count I, Wummel is seeking LTD benefits under ERISA § 502(a)(1)(B). Count I claims breach of fiduciary duty under ERISA § 502(a)(3).

Section 502(a)(3)[7] is a catch-all provision which permits individual beneficiaries to bring suit for equitable relief.  Varity Corp. v. Howe, 516 U.S. 489 (1996).  The applicability of § 502(a)(3) is generally limited "to beneficiaries who may not avail themselves of § [502]'s other remedies."  Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 615 (6th Cir.1998) (citing Varity, 516 U.S. at 512, 116 S.Ct. 1065).  While there are circumstances where claims may be simultaneously brought under § 502(a)(1)(B) and § 502(a)(3), that is only because recovery under the former would not provide adequate relief.  See Gore v. El Paso Energy Corp. Long Term Disability Plan, 477 F.3d 833, 838-42 (6th Cir. 2007).  Here, Wummel can obtain complete relief - an award of LTD benefits- under § 502(a)(1)(B).  As such, his claim under § 502(a)(3) must be dismissed.

With respect to MetLife's decision, from a detailed review of the administrative record, as set forth above, the Court is satisfied that MetLife's decision to terminate Wummel's LTD benefits was neither arbitrary nor capricious.  Although the record shows that while Wummel suffers from headaches, there is no objective medical evidence to support his condition.  The documentation contains merely subjective complaints of headache with no supporting clinical findings that support his claim that he is functionally impaired from performing the material duties of his own job with IBM and entitled to Plan benefits.  Notably, Wummel worked for IBM primarily from his home, reporting to the office only one day every two weeks, and therefore was able to rest periodically.

---

[7]  Section (a)(3) provides that "[a] civil action may be brought" by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

Moreover, Wummel says he played hockey two to three days per week, walked two-mile walks socialize with friends, and rested periodically during the workday. The record does not contain any objective evidence of functional limitations that would preclude Wummel from performing the material duties of his occupation with IBM as of July 12, 2006 or later. Under these circumstances, MetLife's determination that Wummel was not eligible to receive LTD benefits was neither arbitrary nor capricious.

The principal reasons underlying MetLife's decision denying Wummel's claim for benefits are described in the letters sent by MetLife as to his initial claim and on appeal. In these letters, MetLife provided Wummel with a detailed description of the administrative process which had been completed by MetLife, and set forth a detailed analysis of the evidence and other material relied upon by MetLife. The letters specifically describe the various reviews of Wummel's medical file by independent physicians and their conclusions.

Wummel argues that MetLife improperly focused on the fact that his treating physician's have been unable to identify the cause of his headaches in denying his claim. He also argues that MetLife erroneously focused on medical records from his consultation at the Mayo Clinic rather than later treatment at MHNI that, he believes, shows his condition worsened. Wummel, however, fails to recognize that MetLife considered his entire medical history and denied his claim because of the lack of objective evidence of a functional impairment that was sufficient to preclude him from performing his job. Such analysis is consistent with the Plan language.

Wummel also says that his treating physician's were not given sufficient time to respond with comments regarding reports by Independent Physician Consultants. This

argument is not well-taken. There is no requirement under ERISA or the Plan that MetLife provide his treating physicians with an opportunity to comment on findings, much less a time frame in which to do so.

In the end, MetLife provided Wummel with a full and fair review of his claim, as required by ERISA and the Plan. MetLife acknowledged that he has a long history of complaints of headaches that are of unknown origin. However, MetLife did not, as Wummel argues, deny benefits because his headaches are of unknown origin. Instead, in accordance with the law, and the terms of the Plan, MetLife focused its review on whether his headaches caused functional impairment that prevented him from performing his sedentary job with IBM as a systems analyst. As Wummel told his doctors at the MHNI, he was able to maintain good job performance despite headaches. Wummel also told his doctors that 15-20 minutes of rest alleviated his headaches and that his "work-at-home" arrangement with IBM allowed him to rest when needed. Further, Wummel told Dr. Tracy of the Mayo Clinic that he had "never missed work" because of his headaches. He also told Dr. Aksamit of the Mayo Clinic, that he could participate in sports without exacerbating his headaches. Wummel's view that his job performance deteriorated, despite good reviews by IBM, fails to adequately support his claim, because the reviews themselves demonstrate a lack of functional impairment. Finally, MetLife obtained reports from Dr. Leonid Topper and Dr. Susan Pierson, both Independent Physician Consultants, Board Certified in Neurology. Both reports supported MetLife's determination that the medical documents concerning Wummel's headaches did not demonstrate that he had a functional impairment that precluded him from performing sedentary employment. MetLife was entitled to rely on those reports,

which were consistent with the record, in denying Wummel's claim.

As to MetLife's conflict of interest, the court must "look to see if there is evidence that the conflict in any way influenced the plan administrator's decision." Carr v. Reliance Standard Life Ins. Co., 363 F.3d 604, 606 n. 2 (6th Cir. 2004)). Because Wummel has provided no evidence that MetLife's conflict of interest actually motivated its denial of benefits, the mere existence of this conflict does not render its decision arbitrary and capricious. See Cooper v. Life Ins. Co. of N. Am., 486 F.3d 157, 165 (6th Cir. 2007).

Finally, it is important to note that MetLife's denial of Wummel's claim was essentially based on his failure to present objective evidence of any functional limitations resulting from his headaches. Wummel suggests that it is improper to require him to present objective evidence of his level of functionality in order to qualify for LTD benefits under the Plan. The Sixth Circuit has addressed this issue:

> However, the case law of this court, to which this panel must adhere, suggests that it is entirely reasonable for an insurer to request objective evidence of a claimant's functional capacity. This court has held that "[r]equiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable." Cooper, 486 F.3d at 166 (citing Spangler v. Lockheed Martin Energy Sys., Inc., 313 F.3d 356, 361 (6th Cir. 2002)). In Cooper, the court noted that objective medical evidence of the functional capacity of the claimant, who had a lower back injury, would have assisted the insurer in determining whether the claimant was capable of performing the duties of her occupation, as was required by her policy. Id.; see also Oody v. Kimberly-Clark Corp. Pension Plan, 215 Fed.Appx. 447, 452 (6th Cir. 2007) (holding that denial of disability benefits was not arbitrary and capricious where claimant "failed to submit sufficient objective evidence to establish he was permanently and totally disabled, as defined by the Plan"); Nichols v. Unum Life Ins. Co. of Am., 192 Fed. Appx. 498, 504 (6th Cir. 2006) (determining that insurer was not unreasonable in concluding that treating physician's assessment was "largely based on her acceptance of [the claimant's] descriptions of her medical conditions, rather than based on an objective assessment of [the claimant's] medical history").

<u>Rose v. Hartford Financial Services Group, Inc.</u>, 268 Fed. Appx. 444, 453-54 (6th Cir.

2008).  Thus, MetLife was entitled to focus on the lack of objective evidence of the effect

Wummel's headaches had on his functional capacity as a basis for denying LTD

benefits.

IV.  Conclusion

For the reasons stated above, having conducted a thorough review of the

administrative record, MetLife's decision denying Wummel's claim for benefits was

neither arbitrary nor capricious.  The administrative record contains no medical records

evidencing functional limitations that would preclude Wummel from performing his

sedentary employment.  MetLife's decision was the result of a principled, deliberative

reasoning process.  Accordingly, MetLife's motion is GRANTED.  This case is

DISMISSED.

SO ORDERED.


Dated:  May 28, 2010                        S/Avern Cohn                                    
                                            AVERN COHN
                                            UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of
record on this date, May 28, 2010, by electronic and/or ordinary mail.

                                            S/Julie Owens                                  
                                            Case Manager, (313) 234-5160